# Commonwealth *v.* Rothensies, Appellant.

*Criminal law—Indictment—District attorney's bill—Explanation of action.*

Where a district attorney upon his official responsibility and with leave of the court, lays before the grand jury a bill of indictment, he is not required to set forth upon the record his reasons for doing so, or to state them for the information of the defendant.

*Criminal law—Conspiracy—Manipulation of corporations.*

On the trial of an indictment for conspiracy, a judgment on a verdict of guilty against two of the defendants will be sustained, where the evidence shows a long and complicated series of acts extending over a period of years; the creation of three corporations each of which constantly remained under the control of the defendant; a series of transactions by which the assets of one corporation were shifted to the treasuries of the other two, until all such assets disappeared from the view of the stockholders who had furnished the real money embraced in the transactions; that such assets were appropriated by the defendants through illegal dividends or excessive salaries and commissions; and that the transactions in question constantly required the action and coöperation of at least the two defendants to do the things which were done.

In such a case evidence is properly admitted relating to the or-

ganization of the three companies, the manner in which the business of each was conducted, the contracts which the corporations made with each other, and with the defendants, and the various steps which led up to the final ruin of the companies. It is also proper to admit in evidence contracts made with certain persons as inducements to such persons to become directors of the company, where it appears that the contracts in question gave to such persons financial advantages of a character that would induce them to act in a friendly way to the defendants, and not to oppose any measures which they might advocate.

*Criminal law—Trial—Improper remarks of district attorney— Continuance—Withdrawal of juror.*

The appellate court will not review the discretion of the trial court in refusing to withdraw a juror and continue the case because of alleged improper remarks by the district attorney, where it appears that the remarks in question were called forth by a statement of the counsel for the defense, and that they were not of such a character as likely to have a prejudicial effect upon the defendant's cause.

Argued Nov. 11, 1915. Appeal, No. 230, Oct. T., 1915, by defendant, from judgment of Q. S. Berks Co., June Sessions, 1913, No. 168, on verdict of guilty in case of Commonwealth v. David W. Rothensies, Appellant, Frederick G. Anderson, Elwood S. Snyder, Charles A. Stephens, Ed. J. Thomas, John W. Levegood, William E. Fisher, James MacKellar, John W. Pratt and Eugene F. Carpenter. Before RICE, P. J., ORLADY, HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ. Affirmed.

Indictment for conspiracy. Before WAGNER, J.

At the trial the jury returned a verdict of guilty against David W. Rothensies, Frederick G. Anderson and Charles A. Stephens, who were tried together.

On a rule for a new trial and arrest of judgment WAGNER, J., filed the following opinion:

David W. Rothensies, Frederick G. Anderson and Charles A. Stephens, were tried and convicted of the charge of conspiracy to cheat and defraud the Corporation Funding and Finance Company, the Reading Mutual

Life Insurance Company, and the Reading Life Insurance Company, their stockholders and members of the sum of $736,800.00. These defendants, who were tried together, were indicted with seven others in the same bill of indictment.

The Corporation Funding and Finance Company was incorporated by the State of Delaware on October 23, 1908, with David W. Rothensies and two others as incorporators. By amendments to the charter on January 20, 1910, the capital stock of $50,000, divided into shares of $10 each, was increased to $250,000, and, on May 4, 1911, to $500,000. On October 23, 1908, David W. Rothensies, together with the two persons who were the incorporators of the Corporation Funding and Finance Company, procured the incorporation by the State of Delaware of the Reading Mutual Life Insurance Company. This company had no capital stock, but was authorized to issue bonds, etc., for any objects and purposes of the corporation. On April 15, 1909, David W. Rothensies and F. G. Anderson, two of these defendants, together with one other, had incorporated under the laws of the State of Delaware, the Reading Life Insurance Company. The authorized capital of this company was $300,000, divided into 30,000 shares, par $10 per share. Of this Rothensies subscribed for 29,994 shares and Marshall and Anderson for three shares each. The object of the Corporation Funding and Finance Company was to promote and finance the two insurance companies.

At the first meeting of the incorporators of the Finance Company on October 24, 1908, three incorporators, representing the 5,000 shares, elected Rothensies and four other directors. These incorporators, representing the then entire capital authorized the board of directors to accept labor and services as full payment for subscriptions of stock. An agreement was, at this meeting, entered into with David W. Rothensies, that one share of the finance company be issued in repayment of the expenditure made by David W. Rothensies and in payment

for his labor, services and outlay in the sale by the corporation of each share of its capital stock sold, or hereafter to be sold, and provided that the issue of stock to David W. Rothensies, his executors, etc., shall not at any time exceed the amount of the authorized stock of the corporation. He was to turn par into the treasury for all shares sold for the company. At a meeting of the board of directors of said company on October 27, 1908, the president's (David W. Rothensies) salary was fixed at $200 a month, to begin November 1, 1908.

At the first meeting of the incorporators of the mutual company, held October 24, 1908, Rothensies was elected director, and 25 contributory bonds, par $500 were authorized to be issued. He was made the sole agent for the sale of these bonds, and was to receive 25 per cent. of the par value of such bonds sold by him or through his agency. The board of directors was authorized to enter into formally a contract with him as thus specified.

At a meeting of directors of the mutual company held October 27, 1908, David W. Rothensies was elected president of the company at a salary of $200 a month, beginning on November 1, 1908.

At the first meeting of the three incorporators (of whom Rothensies and Anderson were two) of the life company, held on the 15th day of April, 1909, Rothensies, Anderson and one Albert L. Massey were chosen directors. On the same day the contracts existing between the finance company and the mutual company, dated January 1, 1909, and April 1, 1909, were assumed by the life company. These contracts made the finance company the agent of the mutual company to solicit business upon the consideration that the mutual company pay the finance company as compensation 80% of all premiums received on insurance written and issued within the first year; 15% on all premiums received during the second year, and 7½% on all premiums for the succeeding eighteen years. By the agreement of April 1, 1909, the finance company was appointed general agent of the mu-

tual company, and was to receive 80% of the premiums for the first year, 30% for the second year, and 22½% for the third and subsequent eighteen years on insurance written on monthly premiums. At this meeting of the life company of April 15, 1909, it was recited that David W. Rothensies had subscribed for 29,994 shares, A. Donnell Marshall and F. G. Anderson each for three shares, and these were allotted to them. Those allotted to David W. Rothensies were 10,000 shares at par, 10,000 shares at $12.50, and 994 shares at $15.00 per share, to be paid by him when sold at above-stated prices. It will be seen from this that Rothensies was allotted all but six of the then shares of the life company, to be paid upon no consideration other than that they be paid by him when sold at above-stated prices. Rothensies and F. G. Anderson were elected directors. Marshall resigned as president, and Rothensies was elected to succeed him. By these arrangements, contracts, and authorizations the companies were made interdependent, the then ruling factors being Rothensies and Anderson.

Rothensies on October 24, 1908, became a director of the mutual company; on October 27, 1908, he became its president, and on October 29, 1908, he became a member of its executive committee. He was reëlected a member of the board of directors, president, and member of the executive committee until September 26, 1911, when he resigned as president. On October 3, 1911, he resigned from the executive committee, and on November 14, 1911, he resigned as director. He was also similarly connected with the finance and life companies until November 14, 1911, and thereafter was engaged for some time in the sale of stock of the companies.

Anderson, on January 20, 1910, was appointed general manager of the mutual company, and was connected with this company and with the finance company and the life company as superintendent of agencies, vice president, director and member of the executive committee until

March 25, 1912, when he resigned his various offices and position in the three companies.

C. A. Stephens became connected with these companies in July, 1909, as stock sales agent, and then as manager of that department, and continued his connections during most of the time of their existence. During the latter part he was working under the contract of the finance company with Rothensies, which contract had been assigned to him.

The testimony shows that their operations covered a territory consisting of a large part of the eastern half of Pennsylvania. Their method was to go to an influential person of a particular district, who generally was connected either as president or director with some banking institution. These men were induced to purchase stock upon the promise that they would be made directors at a monthly salary of $25, in each of the two companies—that is, that they were to receive $50 a month as directors whether they attended the meetings or not. They were also assured that these salaries, together with the dividends to be declared, would pay the notes given by them for purchase of bonds, subscriptions to stock, and insurance taken.

In several cases written guarantees to this effect were given. False representations relating to the companies' earning capacity, and how the stock of the life company was secured, that is, by depositing certificates of deposits with the insurance department at Harrisburg, were also made to influence persons to purchase stock. To boost the sale of the stock of the finance company at a market price equal at times to twice its par value, at meetings at almost all of which Rothensies and Anderson were present, together with others who were indicted, the following dividends were declared.

| | | |
|---|---|---|
| February 3, 1910, | 5% cash | 10% stock, |
| June 3, 1910, | 5% " | 10% " |
| June 28, 1910, | 5% " | |
| October 14, 1910, | 5% " | |

| | | |
|---|---|---|
| November 11, 1910, | 5% cash. | |
| April 13, 1911, | 3% " | 3% stock. |
| August 17, 1911, | 3% " | |
| January 18, 1912, | 3% " | |
| Total, | 34% " | 23% " |

The resolutions to declare these dividends were always unanimously carried.

On January 20, 1910, the salary of the president of the finance company (Rothensies) was from $200 a month to $5,000 per year, vice president (Anderson), $2,400. On January 19, 1911, the salary of the president was fixed at $3,000, vice president, $2,400. On January 18, 1912, the salary of the president was fixed at $3,000 for the first year, $4,500 the second, and $6,000 the third year. That of the vice-president and manager was fixed at $3,000 the first year; $4,000 the second year, and $5,000 the third year. The salary of the president of the mutual company (Rothensies) was raised from $200 a month to $5,000 a year; general manager, $2,400 (Anderson), with subsequent reductions and increases as aforesaid in finance company.

The total receipts up to the time of the appointment of the receiver about June 1, 1912, of the finance company were $714,263.13. Of this, $334,589.75 was received from the sale of stock, as follows:—$213,846.61 par and $120,743.14 premiums received on said stock or amount above par; $234,710.75 from the sale of the life company stock, and $131,327.35 commission received on premiums for writing mutual company policies.

The total receipts of the mutual company were premiums $224,157.14; $22,000 from the sale of contributory bonds, and contributions from the finance company of $106,211.87, together with items for interest, etc., totaling $369,559.79. The receipts for the two companies were $1,083,822.92, which, by reason of duplication of the amount of $106,211.87, carried on the books of both companies as assets, leaves a total of receipts of $846,283.70 (N. of T., p. 307, etc.). The proceeds of the sale

of stock of the life company all went into the treasury of the finance company.

At the time the finance company went into the hands of the receiver (June 5, 1912), it had $32,324.88, and the mutual company at about this time had a balance of $29,701.75, showing the total of $62,026.83, making the amount disposed of to June 5, 1912, $784,257.07 (N. of T., p. 310, etc.). This amount of $62,026.83 was mostly represented by certificates of deposits. These certificates of deposits had been hypothecated or given as collateral security for the discounting of $203,856.75 of notes, the proceeds of the discount of which had already been received by the companies. (N. of T., pp. 311, 312.) These certificates, therefore, were not the absolute property of the companies, and could become such only when the makers of the notes that were discounted paid them. Mr. McGinnis, the receiver, on page 392, testified that of these he got but one, a $5,000 certificate, up to the time of the trial.

Of the total received by the companies there was traced on the books of the companies to Rothensies in salaries, commissions, etc., before his contract was assigned to Stephens, a total of $64,634.08 (N. of T., 321). This does not include what he received from the sale of bonus stock, nor what, if anything, came to him out of the Stephens' account. Stephens' receipts as traced from the books were $75,437.93 (N. of T., p. 322). Anderson's receipts were $16,228.13 (N. of T., p. 340).

The evidence demonstrated that these three corporations were wholly dominated by two of these three defendants, and the third was a chief factor in the sale of stock and division of moneys. Dividends were declared with such frequency and for amounts in no way warranted by the finances of the finance company. Moneys were received into these companies not for their benefit, but for the enrichment of at least these three defendants. From the entire evidence it can be said in this case, as in Commonwealth v. Fulton, 56 Pa. Superior Ct.

8'6, 88, a case very similar to this, that it "showed a long
and complicated series of acts, extending over a period
of years; the creation of a number of corporations, each
and every one of which, however, constantly remained
under the control of the same persons; a line of transac-
tions by which the assets, real or apparent, of one cor-
poration were shifted to the treasury of the next until
all of them disappeared from the view of the stockholders
who had furnished the real money embraced in the trans-
actions.   It exhibited the various steps that had been
taken to bring about the final result; that it constantly
required the action and coöperation of two or more peo-
ple to do things that were done, and it almost irresistibly
led to the conclusion that this harmony of action was
neither accidental nor born of ignorance of the conse-
quences that would follow.   The results that did follow
seem to us as they seemed to the jury, to have been what
would naturally be expected,......There was a case
made out by the Commonwealth which the learned trial
judge must have necessarily submitted to the jury, and
if they (jury) accepted as credible the testimony of the
Commonwealth's witnesses, there was no legal obstacle
in the way to prevent their conclusion that the acts
proven were the consequences of a combination......to
bring about what he finally achieved."   There was suffi-
cient in this case to warrant a conviction of each one of
the three defendants tried.

The eighth reason for new trial assigns the refusal of
the court to affirm defendants' seventh point, the gist of
which was that the court instruct the jury that all evi-
dence as to contracts entered into, and salaries and com-
missions received must be disregarded by the jury.

These salaries, commissions and contracts were the
means used by defendants to divert to themselves the
moneys of the corporation, etc.   The submission of these
contracts was objected to at the time that they were ad-
mitted upon the ground that Anderson and Stephens at
the time that they were executed with Rothensies had no

connection with Rothensies, in whose favor they were made.   That, therefore, whatever, was done in connection therewith was barred by the statute of limitations. The same objection was made to reading of the minutes of the first meetings of the incorporators of these various companies, and to other similar matters.

In order to show the whole scheme to defraud as throwing light upon the conspiracy when Anderson and Stephens entered into this scheme, with Rothensies, the whole history of the corporations, their incorporators, contracts, etc., was necessary to be given.   This evidence showed the origin of the scheme and the means employed by the three to defraud the companies, etc., when subsequently Anderson and Stephens entered into this scheme with Rothensies, and made it and all that bore thereon, their own.   It was evidence showing the object towards which Rothensies was operating, and which object subsequently Anderson and Stephens by conspiring with Rothensies, made their own. , As was said in Commonwealth v. Fulton, supra, p. 88, "If the defendants were to be tried at all, it was as necessary that there should be laid before the jury the history of all their transactions which finally led up to the particular results complained of in the bill."   And, as was said by Justice HENDERSON, in Commonwealth v. Moyer, 52 Pa. Superior Ct. 548, on p. 554. "This evidence was admitted to show the development of the arrangement which resulted in the transaction out of which the prosecution grew.   It was necessary to make a beginning of proof, and a logical order was observed in the presentation of the Commonwealth's evidence.......A large discretion is allowed to the presiding judge in the admission of evidence on a trial for conspiracy having numerous actors and shifting scenes of action as the fact of conspiracy is often made out by the association of detached facts and by the reasonable interferences deducible therefrom."

Neither does the fact that some of these circumstances

were outside of the statutory limit make them incompetent as evidence if they, with other subsequent circumstances, form a connected series of acts, pave the way, lead up to and throw light upon the conspiracy laid in the indictment to have occurred within the statutory period.   These circumstances are also evidence against all those indicted who subsequently enter the scheme and become a party to it.   In Commonwealth v. Bartilson, et al., 85 Pa. 482, on p. 489, Mr. Justice PAXSON says: "The fact that a conspiracy existed on the 21st day of May, 1877, or upon any other day within two years of the exhibiting of the bill of indictment, may be shown by the previous acts, conduct or declarations of the parties.

"The statute of limitations affects the crime, not the proof of it.   It is rare that a conspiracy can be established by direct proof.   As a general rule conspirators do not publish their intentions.   Hence it is that their object, and the conspiracy itself, must usually be shown by their acts.   It is said in Roscoe on Criminal Evidence, at page 415: 'If on a charge of conspiracy it appears that two persons by their acts are pursuing the same object, and often by the same means, the one performing part of an act, and the other completing it for the attainment of the object, the jury may draw the conclusion that there is a conspiracy.'   All the leading text writers assert this doctrine, and it is sustained by numerous decisions which it is not necessary to refer to.   Acts and declarations of the parties prior to the statutory period may be given in evidence, provided they tend to show a conspiracy existing at the time charged in the indictment.   It is true they would not be admissible for the purpose of proving a distinct crime barred by the statute.   But where in conspiracy an overt act is done within two years, and said act is but one of a series of acts committed by the parties, evidently in pursuance of a common design and to carry out a common purpose, such acts would be evidence, provided they tend to show

that the last act was a part of the series and the result of an unlawful combination; and such evidence may satisfy a jury of the existence of a conspiracy at the later period.......'Every overt act, to be evidence, must have at least a tendency to prove either the general nature of the conspiracy, or that one or more of the defendants were operating towards effecting that which is charged in the indictment as being the object of the conspiracy.' ......And all who accede to a conspiracy after it is formed become conspirators." In Commonwealth v. Donnelly, 40 Pa. Superior Ct. 116, it is held: "A conspiracy formed by certain persons may be considered as adopted by others who come into the transaction at a later stage of the performance," and on page 125 of said case we have, "In our opinion, the evidence and the papers admitted and complained of in said seven assignments of error were material and relevant for the purpose of showing the foundation and history of the entire transaction, and even if some of the things complained of occurred more than two years before the finding of the bill, they were not therefore necessarily incompetent." See also Commonwealth v. Sanderson, 40 Pa. Superior Ct. 416, 473; Commonwealth v. Wasson, 42 Pa. Superior Ct. 38, 51. Whether these contracts that had been entered into with the corporations were the preliminary stages of the scheme, and whether the salaries and commissions were fair and legitimate or a part of a scheme, or merely a means to procure the moneys of these corporations, etc., were questions to be settled not by the court but by the jury from the entire evidence in this case.

The ninth reason assigns as error the nonaffirmance of defendants' ninth point. This requested the court to charge the jury that from all the evidence the moneys expended by the finance company in establishing agencies and writing insurances were legitimately expended; that it was right and proper to include this equipment in the assets of the finance company, and that

even if the estimates were excessive, unless followed by
proof that such estimate was made in bad faith it must
not be considered in determining the guilt or innocence
of the defendants.     The point further requests the court
to say to the jury that there was no proof of bad faith.

These matters, as in the preceding reason, were for the
jury's determination.

The tenth and eleventh reasons refer to the nonaffirma-
tion of the tenth and eleventh points, wherein the court
is requested to instruct the jury that upon the second
and third counts there cannot be a verdict of guilty.

No question is raised as to the sufficiency of the first
counts.     The jury found the defendants guilty upon the
three counts.     Even, therefore, if these two counts com-
plained of cannot be sustained, as alleged by defendants'
counsel, with whom, however, we do not agree, the first
count is sufficient upon which to rest a verdict and judg-
ment.     These reasons, therefore, do not support either
an arrest of judgment or the granting of a new trial:
Commonwealth v. McDermott, 37 Pa. Superior Ct. 1, 9;
Stahl's App., 1 Pa. Superior Ct. 496, 501; Common-
wealth v. Stanley, 39 Pa. Superior Ct. 402, 404; Com-
monwealth v. Bradley, 16 Pa. Superior Ct. 561.

The twelfth reason refers to the overruling of defend-
ants' objections to the admission of the minutes of the
finance company showing the resolution giving to David
W. Rothensies one share of its stock for each share of
stock sold by him.

This was objected to upon the ground that what was
done there was barred by the statute of limitations, and
that Anderson and Stephens then had not yet any con-
nection with the corporations.     This reason has already
been considered in connection with the eighth one and
requires no further discussion.     The statement of Mr.
Dickinson, one of the defendants' counsel, on page 418,
N. of T., also indicates a waiver of the objection to the
admission of these minutes and a desire to have them ad-
mitted for the purpose of showing by the minutes that

all that was done by the defendants was open, and duly recorded upon the books, and for this reason evidence rebutting fraud.

The thirteenth alleges as error the overruling of defendants' objections to the admission of proof of conversations and correspondence had between the defendants and other individuals for purpose of showing misrepresentations to them in sale of stock of the finance company, the life company, and the purchase of mutual company insurance.

The supplementary reasons filed give the following instances: The conversations and correspondence between Dr. C. C. Spicher and David W. Rothensies, wherein Spicher testified that he had seen Rothensies, Anderson and Stephens; that he had bought forty shares of stock to be paid on the installment plan, and a bond for $500. He stated that he gave his note therefor, which note was to be paid by salary as director. That stock was sold on their representations that if he did not like the stock they would resell it for him; that notes given by him were therefore discounted, the moneys spent, and the promises to him not kept. That in a letter by Rothensies to Spicher he practically confirmed the misrepresentations made by Vollmer, an agent for the sale of stock of the finance company, that he would guarantee a thirty per cent. dividend by July 1, 1910; D. W. Rothensies, as president of the finance company (N. of T., p. 67) wrote Spicher that on Thursday a fifteen per cent. dividend had been declared and that it looked as though they could pay from five to ten per cent. every quarter, and told him to inform purchasers of stock of this fact, and that they would get a fifteen per cent. dividend on March 1st. The other misrepresentations were similar ones by Rothensies and Anderson to Dr. H. Y. Horn and Rothensies, Anderson and Stephens to D. H. Keller, L. L. Bailey, H. J. Pierson, G. A. Schneebeli, J. H. Bridegam and others, with results similar to the Dr. Spicher case.

These were all relevant as bearing upon the system

and method pursued by these men to get money into these corporations and then divert a large portion of it to their own purposes. They were, of course, evidence of a series of frauds perpetrated upon these men in procuring from them their money for the companies. This, however, was not the purpose of the evidence. It was offered as throwing light upon the fraud and conspiracy charged in the bill of indictment. These were all detached facts, yet, in view of the similarity of the method pursued, taken together, they threw light upon the object sought to be accomplished by these defendants. They are all related facts which must be considered as bearing upon the whole scheme. As was said in Montgomery Web Co. v. Dienelt, 133 Pa. 585, on page 595: "There probably never was a case of circumstantial evidence that could not be blown to the winds by taking up each item separately, and dismissing it with the conclusion that it does not prove the case. The cumulative force of many separate matters, each perhaps slight, as in the familiar bundle of twigs, constitutes the strength of circumstantial proof." See also Commonwealth v. Beard, 48 Pa. Superior Ct. 319, 330.

The fourteenth reason refers to the admission of financial statements of the finance company, and the reports of the mutual company for years 1910 and 1911.

The purpose for which the mutual reports were offered is thus stated by counsel for Commonwealth (N. of T., p. 378):

"We offer in evidence the annual reports of 1910 and 1911 of the Reading Mutual Life Insurance Company for the purpose of showing that they were sent out to show to the policyholders of the mutual company a flourishing condition and a surplus, which, as a matter of fact, did not exist, for the purpose of getting people to take out policies of life insurance."

The testimony of Mr. Weaver showed that the surplus as stated in the mutual reports was not correct; that in the 1911 finance company financial statement in "ac-

counts receivable" was contained an item of $201,441.93, of which $142,711.87 was contributions to the mutual company. The finance company in its assets included these contributions to the mutual company, thereby putting upon it the nature of a loan, whilst the mutual company also showed this as an asset of that company, and not something to be repaid to the finance company. That is, there was a duplication of this sum of $142,711.87 in these two reports. It was therefore competent as bearing upon the falsity of the reports sent out to the stockholders and the public as an inducement to them to buy stock or take out insurance. Another answer to this objection is that as to the finance statements, their admission, together with the purpose thereof, was not objected to (N. of T., pp. 336, 337).

The fifteenth reason refers to the admission in evidence of sales of bonus stock by Rothensies to Peters, and Rothensies to W. A. Heitshue. This was admitted for the purpose of showing the money derived by Rothensies in this transaction, which was additional to what he received from the companies as shown on the books, and was relevant for this purpose.

The seventeenth reason has been withdrawn by the defendants.

The nineteenth states as error the admission of the testimony of the receiver of the finance company and the life company to show the assets received by him.

We have already considered the amounts of money received by these companies in their little over four years' existence, and the amount and character of the assets received by the receiver. Commonwealth v. Moyer, supra, is an answer to this objection, where, on page 556, Justice HENDERSON says: "Objection is made in the fourteenth assignment to the admission of the evidence of Mr. Larrabee, receiver of the National Protective Association appointed by the Court of Common Pleas of Dauphin County showing the steps he had taken to locate the property of the National Protective Association

and to what extent he had recovered it. As the indictment charges an unlawful and fraudulent appropriation of the assets of the National Protective Association to the prejudice of its members as the object of the conspiracy it seems a pertinent line of inquiry in support of the conspiracy charged to show that the property of the association had been embezzled or dissipated. That would be persuasive evidence of the fact of the existence of the conspiracy.

The twentieth charges as error the admission of evidence to show that no moneys of any of the companies was deposited with the insurance commissioner at Harrisburg. A number of these witnesses to whom stock was sold testified that they subscribed upon the faith of. the representations made that the stock was guaranteed or protected by deposits with the insurance department at Harrisburg. It was conclusively shown that there were no such deposits as represented. This proved the falsity of the representations and showed the methods pursued to procure subscriptions.

The twenty-second and twenty-third reasons alleged as error the admission as evidence of correspondence of defendants with persons and circulars sent out by them to induce sales of stock. These matters had a relevancy to the methods pursued by these defendants and was therefore evidence in the case.

The twenty-fourth complains of the refusal to allow the defendants to offer letters, as they claim, of the same general character. The purpose of the letters referred to in the twenty-second and twenty-third reasons was to show false statements made and methods pursued to induce persons to buy stock. The letters made the basis of the twenty-fourth reason were those issued by the defendants for the purpose of showing the bona fides of these defendants by reason of laudatory letters which they themselves issued.

The last reason to be considered is the eighteenth. This refers to remarks made by the district attorney,

Mr. Heinly, in his closing address to the jury, which remarks defendants claim were improper and such as entitle them to a new trial.

There can be no question as to what was actually said by the district attorney, the exception thereto, and the ruling of the court, together with the remarks of counsel for defendants (Mr. Schaeffer), in his closing address which brought forth the remarks of the district attorney, for the reason that the two stenographers who are assigned to this court were both present and took down the entire addresses of both counsel, together with the exception and ruling thereon at the time when they were made. What was said by the district attorney must be viewed in the light of what was first said by Mr. Schaeffer when he stated: "The commonwealth is bound to prove this charge; we are not bound to prove our innocence; and the fact that they took five days and a half to present their case, and we took one hour, shows to you, gentlemen of the jury, that they must have considered that they had a pretty hard job on hand." It will be noticed that defendants' counsel here laid stress upon the fact that the Commonwealth consumed five and a half days in presenting their evidence, and that the defendants, to prove their innocence, consumed but one hour's time, and from this evidently desired to convey to the minds of the jury the desperateness, as defendants' counsel claimed, of the Commonwealth's case against defendants. It was this which brought forth the remarks of the district attorney in the opening part of his closing speech, where, as is shown on the record (N. of T., p. 423), he stated: "I said that for five and a half days the Commonwealth introduced evidence in this case. My learned friend on the other side said it must be a desperate case or we would not have consumed five and a half days in offering evidence. Why, gentlemen of the jury, we had to stop somewhere in this mass of corruption and fraud; we had to stop somewhere, but we could be keeping on still and the story would only be half told, for I

tell you that you are sitting now in a case involving the biggest swindle that has ever been pulled off in the County of Berks, and you are now trying three of the men" —.   After the district attorney had proceeded thus far, Mr. Dickinson, as one of counsel for defendants, made this specific objection : "We desire to make objection to the remarks of that character.  It is for the jury to determine whether or not it was a swindle and it has nothing to do with the issue now trying," to which Mr. Heinly replied, "I had not yet finished," in answer to which Mr. Dickinson stated, "I would like to have those notes transcribed and the remarks put upon record, and I ask that a juror be withdrawn and the case continued." The request to have a juror withdrawn was overruled, and an exception given for defendants.  Mr. Heinly then continued, "I will now proceed.  I was about to say that you are sitting in a case involving the largest swindle— and of these defendants three men are on trial—according as the evidence has developed in this case and as I shall picture it to you now."

From this objection of Mr. Dickinson it is seen that what he refers to as remarks of character are remarks with regard to the swindle.  He specifically says, "It is for the jury to determine whether or not it was a swindle and it has nothing to do with the issue now trying." When the district attorney stated to the jury that they were sitting in a case involving the biggest swindle that had ever been pulled off in the County of Berks, it is evident that it was not his purpose to interject into the jury an opinion of his own or any statement of undisclosed evidence, but that, as he contended, a legitimate inference for them to deduct from the evidence that they had heard in this case and which, as he stated, he was about to picture to them.  Nor does he refer, as the basis for that inference, to any other evidence than that which developed in the case, or, in other words, that which was heard and submitted to the jury.  In the fifth point submitted by the defendants they requested the court to in-

struct the jury that they must find from the evidence in the case, beyond a reasonable doubt, that the defendants colluded, etc. This point we affirmed. On page three of the charge we say, "If the jury is clearly satisfied by the evidence that all the defendants, or two or more of them, entertained an unlawful design," etc. On page four we refer to the evidence relied upon by the Commonwealth to prove the charge. And so, in other parts of the charge we refer to the evidence in this case as that upon which there would have to be a conviction, if any. On page six we refer to this evidence when we stated that it had been fully discussed by counsel for defendants and by the Commonwealth. Whilst defendants, in their twenty-first reason for a new trial, alleged as error the charge of the court; yet, at no place does it set forth wherein this error consisted. In the brief submitted by defendants at the argument, wherein, according to the rules of our court, the reasons must be set out in full, as filed, this twenty-first reason is omitted, was not argued on the rule for a new trial, and we therefore view this reason as having been abandoned, and that consequently defendants are satisfied with the correctness of the charge.

The defendants filed their affidavit as to what occurred and what was said when remarks were made by the district attorney wherein their version of what occurred is given. The purpose of this affidavit at the time it was filed, as we understood it, was that defendants' counsel conceived it a necessary step to raise this question on a motion for a new trial. This, however, was not necessary as the stenographers were present, had noted what was said, together with the exception and the ruling of the court which were made a part of the record, and which fully protected the defendants without this affidavit. We are of the opinion that the remarks made by the district attorney as to what he claimed to be a swindle was not an improper inference when taken into consideration with all that he said upon it; that is, as the evidence showed and as he would detail it. Even if the de-

395, (1916).] Opinion of Court below—Assignment of Errors.

fendants' counsel, in their objection, intended to refer also to the remarks of the district attorney wherein he said, "I said that for five and a half days the Commonwealth introduced evidence in this case. My learned friend on the other side said it must be a desperate case or we would not have consumed five and a half days in offering evidence. Why, gentlemen of the jury, we had to stop somewhere in this mass of corruption and fraud; we had to stop somewhere, but we could be keeping on still and the story would only be half told," we are convinced that those remarks in no way prejudiced or influenced the minds of the jurors in coming to their conclusion. In the addresses to the jury, neither counsel for defendants nor counsel for Commonwealth attempted in any way to argue upon any evidence that had not been submitted. What they did was to review the evidence as submitted in this case, together with the inferences that they claimed from this evidence. Considering this in connection with the charge wherein we, time and again, refer to the evidence of the case, we are convinced that the only evidence considered by the jury in finding the defendants guilty was that submitted and which we are not satisfied warranted a new trial.

A motion for arrest of judgment was also filed and a rule granted thereon. This matter we have already considered in the tenth and eleventh reasons for a new trial. We do not find any merit in any of the reasons filed either for a new trial or for arrest of judgment.

Rules are therefore discharged.

*Errors assigned* were various rulings on evidence and instructions sufficiently appearing by the opinion of the Superior Court.

*Joseph R. Dickinson,* with him *Harry D. Schaeffer,* for appellant.

*Harvey F. Heinly,* District Attorney, and *Samuel E. Bertolet,* for appellee.

OPINION BY PORTER, J., October 9, 1916:

The appellant was, with Frederick G. Anderson and Charles A. Stevens, convicted in the court below of having entered into a conspiracy with intent to cheat and defraud certain corporations, their stockholders and members. The testimony produced on the trial covers upwards of five hundred and fifty pages; we have here forty-nine printed pages of assignments of error, it is, therefore, apparent that it is impracticable to review the case in detail in this opinion. Such a review is, in our judgment, not at all necessary. The facts of the case are fully stated in the opinion of the learned judge of the court below refusing a new trial, which will appear in the report of this case.

The bill of indictment was laid before the grand jury by the district attorney upon his official responsibility, after first having obtained an order of the court below permitting him to do so. It is well settled that the district attorney is not required to set forth his reasons for presenting a bill in this manner. "It necessarily follows that, upon appeal, no presumption that the district attorney did not have valid reasons for proceeding in this mode arises from his refusal to set them forth upon the record, or to state them for the information of the defendants......Viewing this as a district attorney's bill, sent to the grand jury by that officer upon his official responsibility and by leave of court, we are unable to conclude from the record before us that the action complained of was an abuse of discretion both manifest and flagrant": Commonwealth v. Sharpless, 31 Pa. Superior Ct. 96; Commonwealth v. Ramsey, 42 Pa. Superior Ct. 25. The first and second specifications of error are overruled.

The specifications of error which are founded upon exceptions to the action of the court below in refusing to direct the jury to find a verdict of not guilty cannot be sustained. The evidence in the present case was strikingly similar to that considered by this court, under a

similar specification of error, in the case of Common-
wealth v. Fulton, 56 Pa. Superior Ct. 86, and the lan-
guage of our Brother HEAD in his opinion in that case
is here peculiarly applicable. "We think it sufficient to
say, after a careful reading of the evidence, we are con-
vinced it tended to establish every ingredient of the of-
fense charged. It showed a long and complicated series
of acts, extending over a period of years; the creation of
a number of corporations each and every one of which,
however, constantly remained under the control of the
same persons; a line of transactions by which the assets
real or apparent, of one corporation were shifted to the
treasury of the next until all of them disappeared from
the view of the stockholders who had furnished the real
money embraced in the transactions. It exhibited the
various steps that had been taken to bring about the final
result; that it constantly required the action and coöp-
eration of two or more people to do the things that were
done and it almost irresistibly led to the conclusion that
this harmony of action was neither accidental nor born
of ignorance of the consequences that would follow. The
results that did follow seem to us, as they seemed to the
jury, to have been what would naturally be expected, and
the appellant has not much ground to complain that the
explanation he attempted to offer of these various trans-
actions was not accepted by the jury. In a word then,
there was a case made out by the Commonwealth which
the learned trial judge must have necessarily submitted
to the jury, and if they accepted as credible the testi-
mony of the Commonwealth's witnesses, there was no
legal obstacle in the way to prevent their conclusion
that the acts proven were the consequence of a combi-
nation of the appellant with others to bring about what
he finally achieved."

The specifications of error which complain of the ad-
mission of evidence during the trial relating to the or-
ganization of the various corporations, the manner in
which the business of each was conducted, the contracts

which the corporations made with each other and which they made with this appellant, and the various steps which led up to the final catastrophe are absolutely without merit. This appellant, on October 23, 1908, caused to be incorporated in the State of Delaware the Corporation Funding and Finance Company and, also, the Reading Mutual Life Insurance Company. The certificate of incorporation of the finance company set forth the names of but three original stockholders, this appellant and two persons who were citizens of Delaware. The evidence clearly indicates that the two citizens of Delaware merely joined in the organization of these corporations for the purpose of the formal organization of the companies, they had nothing to do with the subsequent proceedings of the corporations, had no interest in them, and evidently knew nothing of the purposes for which the appellant intended to use the corporations. The appellant subsequently became the president, a director and a member of the executive committee of each of the corporations and so continued until November, 1911. The three incorporators met on the 24th day of October, 1908, at Dover, in the State of Delaware, and there proceeded to organize the corporations. The incorporators of the finance company at that meeting adopted resolutions reciting that it had been agreed between each of the incorporators and David W. Rothensies that one share of stock of the Corporation Funding and Finance Company be issued in payment of the expenditure made by the said David W. Rothensies and in payment for his labor, service and outlay in the sale by the corporation of each share of its capital stock sold or thereafter to be sold by him; that it had been further agreed that on notice by the said David W. Rothensies to the president or directors of the company, hereafter to be chosen, that he has sold for the company any number of shares thereof and the payment into the treasury of the said company of the par value of the number of shares which he so notifies the said president or directors,

has been sold there shall be duly issued to the said David
W. Rothensies a number of shares of the said company
equal to the number so sold and paid for, which said
shares shall be his absolute property and which stand in
his name on the books of the said corporation unless or
until by him assigned, transferred or set over to other
persons, and that no other payment shall be required of
the said David W. Rothensies than the services, labor,
&c., heretofore mentioned and that the said shares shall
not be assessable to any extent whatever; and the board
of directors were authorized and directed to accept such
labor, services and payments to its use as of full payment
of the subscription for stock so to be issued to the said
David W. Rothensies. This contract was for all prac-
tical purposes made by Rothensies, as an individual,
with himself as the corporation; for Rothensies was the
corporation. It is here important to observe that the
certificate of incorporation expressly vested in the board
of directors of the finance company authority to deter-
mine the time, places and conditions under which the
books of the corporation, or any of them, shall be opened
to the inspection of the stockholders; "and no stock-
holder shall have any right of inspecting any account or
book or document of this corporation except as conferred
by statute or authorized by the directors, or by a reso-
lution of the stockholders." This placed it in the power
of the board of directors, which body was under the
control of this appellant, to prevent any stockholder
from discovering what contracts the company had made
with its officers or how the business was being managed.
On January 1, 1909, the appellant and his associates
acting as the Corporation Funding and Finance Com-
pany entered into a contract with themselves acting as
the officers of the Reading Mutual Life Insurance Com-
pany, under the provisions of which the finance company
became the sole agent to solicit business for the mutual
company at a compensation to the finance company of
eighty per cent. of all first year's premiums on insurance

written, fifteen per cent. of the second year's premiums and seven and one-half per cent. on the next eighteen years' premiums. The Reading Mutual Life Insurance Company had no capital stock, but it never issued any mutual insurance policies, all the policies issued by it having been life policies upon which an annual premium was to be paid. The evidence indicates that from the inception of the scheme the intention was at a later date to form a stock life insurance company which should take over the policies that had been issued by the Reading Mutual Life Insurance Company. The companies being thus ready to start business, Frederick G. Anderson became superintendent of agencies for the finance company on January 21, 1909, on April 20, 1909, he became a director and vice-president of that company; on August 5th he became a member of the executive committee, and continued to hold those offices until March 25, 1912, when he resigned. He became general manager of the Reading Mutual Life Insurance Company on January 20, 1910; on October 3, 1911, he became vice-president of that company and a member of the executive committee; on January 18, 1912, he became a director and continued to hold these positions until March 25, 1912.

On April 15, 1909, David W. Rothensies and F. G. Anderson, two of these defendants, together with another who is a citizen of Delaware caused to be incorporated under the laws of the State of Delaware, the Reading Life Insurance Company, Rothensies became the president of this company, a member of the board of directors and a member of the executive committee and so continued until late in the year 1911. Anderson became a director of this company and, on January 20, 1910, became its vice-president, and its general manager on January 18, 1912, retaining these offices until he resigned in March, 1912. This company continued under the direct control and dominion of Rothensies and Anderson down until the time they resigned, shortly after

which the whole system collapsed. The Reading Life Insurance Company never issued a policy; the capital stock of the company was fixed at $300,000, divided into 30,000 shares of the par value of $10 per share. At the first meeting of the incorporators of the life company Rothensies was allotted 29,994 shares of this stock, 10,000 shares at par, 10,000 shares at $12.50 and the balance at $15.00 per share, to be paid for by him when he sold at the above prices. This placed practically all the stock of the company in the hands of Rothensies, but he was not required to pay for it until he had sold it to outside parties, and when he did sell it he was entitled to retain for his services any amount realized above the prices in-. dicated. When Rothensies did subsequently make sales of the stock he turned the proceeds of the sales into the treasury of the funding and finance company and not into the treasury of the Reading Life Insurance Company, to which it belonged. The amount of money which ought to have gone into the treasury of the life company from the sale of its stock but which was diverted into the treasury of the finance company was $234,710.75. The officers of the mutual company and the finance company diverted to their own pockets large sums of money in the shape of salaries, commissions and dividends on finance company's stock. Excessive dividends were declared upon the stock of the finance company, in order to facilitate sale of stock of that company from which the appellant realized very handsome commissions. The result of the contract between the Mutual Life Insurance Company and the Corporation Funding and Finance Company, which Rothensies had made as the representative of both companies, diverted the premiums received by the mutual company into the treasury of the finance company, the contract of Rothensies with the Reading Life Insurance Company, under which he obtained absolute control of almost the entire issue of that company's stock put it into his power to divert the moneys received from the sale of that stock to the treasury of the

finance company. The contract which Rothensies, acting as the Corporation Funding and Finance Company had made with himself as an individual enabled him, with the aid of his co-conspirators, to absolutely control that corporation and make such distribution of the funds which came into the treasury of that company, from all sources, as might be dictated by his own cupidity. The result was that at the end of the year 1911 the Reading Mutual Life Insurance Company did not have enough money left to pay in the small amount of money required by the laws of the State of Delaware as a reserve to secure its policyholders. The extent to which the companies could be successfully plundered had almost reached its limit. Rothensies resigned his various offices in the corporations late in 1911 and Anderson resigned in March, 1912; when, in June, 1912, receivers were appointed for the corporations the money which ought to have gone into the treasury of the Reading Life Insurance Company, as the proceeds of the sale of its stock, was not there and it had entirely disappeared from the treasury of the finance company; there went into the hands of the receiver for the finance company only the sum of $32,324.88, and the mutual company at about this time had a balance of only $29,701.75. The mutual company had paid as benefits to the holders of its policies the sum of $30,000. The sum of $784,257.07 of the total received from all sources by the several companies had in some way been disposed of under the direction and management of this appellant and his codefendants, as is shown by the opinion of Judge WAGNER, of the court below, refusing a new trial. Whether the contracts which had been entered into by the several corporations with each other and by this appellant with the several corporations were made in good faith and honestly intended, or were made in pursuance of a conspiracy on the part of the defendants for the purpose of so using them as to defraud the several corporations and their stockholders and members was a question of fact to be de-

termined by the jury under the evidence in the case. The specifications of error which refer to the admission of these contracts in evidence and the refusal of the court to instruct the jury to disregard them are dismissed.

The appellant and his associates dominated the several corporations, but they were trustees for the innocent policyholders of the Mutual Life Insurance Company and the unsuspecting stockholders of the Corporation Funding and Finance Co. and the Reading Life Insurance Co. These contracts were at the very foundation of the scheme to defraud and the contracts and all that was done by the defendants under them in the management of the several corporations were properly admissible in evidence: Commonwealth v. Donnelly, 40 Pa. Superior Ct. 125; Commonwealth v. Sanderson, 40 Pa. Superior Ct. 473; Commonwealth v. Cotter, 55 Pa. Superior Ct. 554; Commonwealth v. Fulton, supra.

The specifications of error which refer to the admission in evidence of testimony as to the manner of the sales of life insurance and shares of stock to persons who became directors of the corporations are not well founded. This testimony disclosed that this appellant and Anderson in some cases both joining in the proposition to a man whom they wished to have as a director of the corporations would make him a proposition to sell him a bond of the Reading Mutual Life Insurance Co., a life insurance policy of said company and a number of shares of stock of the Corporation Funding and Finance Co., or the Reading Life Insurance Co. and take his note for the amount of the premium on the life insurance policy and the price of the shares of stock in the other corporations, agreeing that the purchaser should not be called upon to pay the note, but that he would be elected a director in the companies and be paid a salary, as director, of twenty-five dollars a month by each corporation, said salary and the dividends upon his stock in the funding and finance company to be credited upon the note until it was paid. It may be well to give a single in-

stance, which is a fair specimen of all the transactions to which these specifications of error refer. This appellant and Anderson sold to L. L. Bailey one bond of the Reading Mutual Life Insurance Co. for $600; a five thousand dollar policy of insurance in said company, the premium on which was $379 and fifteen shares of stock of the Corporation Funding and Finance Co. for $150; making a total of $1,129, for which amount he gave his note. It was at the time agreed that Mr. Bailey should not be required to pay this note, that he should be elected a director of the two corporations at a salary of twenty-five dollars a month from each, which salary together with the profits from the Corporation Funding and Finance Company's stock should be credited upon the note until it was paid. This transaction involved the issuance of a life insurance policy, not a mutual policy, upon the express agreement that the insured should not be required to pay the first premium, and put into the possession of Mr. Bailey a bond of the Mutual Life Insurance Co. for $600, for which he was to pay nothing save to serve as a director in the Mutual Life Insurance Co. and in the Finance Company. The sale of insurance, bonds and stock in this unusual manner was perhaps partially to be accounted for by the fact that Rothensies, under the contracts hereinbefore referred to, would receive for himself fifteen shares of the stock of the funding and finance company, as his compensation for making the sale to Bailey, but it is only reasonable to assume that the principal purpose of Rothensies and Anderson in making a contract of this character was to procure for these corporations a director who would be subservient to their wishes because of the very manner in which he had acquired his interest in the corporations. Bailey was elected a director, and his note was subsequently cancelled by crediting upon it his salary of $50 a month, $25 from each corporation, and the dividends declared upon the stock which he held in the finance company. Mr. Bailey, no doubt, entered into the ar-

rangement innocently, but it is manifest that it was a shrewd move upon the part of the appellant and Anderson to obtain a director who would be friendly to them and not likely to oppose any measures which they might advocate. The testimony shows that Rothensies, in at least one other case, assisted by Anderson, made at least six sales of stock, bonds and policies of insurance and took the notes of the purchaser for the amount thereof under an arrangement similar to that made with Mr. Bailey, in each case agreeing that the purchaser should be made a director in two of the corporations. The fact that every one of the parties with whom such an arrangement was made became directors in the corporations not only makes clear the absolute domination of the companies by Rothensies and his associates but is evidence of the manner in which it was proposed to continue that domination, by procuring as directors men who would not be anxious to ferret out irregularities in the management. These directors were all given to understand that the board of directors met only once in three months, at the City of Reading, and the evidence indicates that they gave very little attention to the business of the company and accepted as verity the reports of the executive officers. We do not find in the case anything to justify us in sustaining any one of the specifications of error which relate to the admission of this evidence.

The 16th and 19th specifications of error relate to evidence which affected only the defendant Stevens, relating to statements which he had made as to the standing of the companies. It was clearly established by other evidence that this appellant had made like representations. The evidence admitted under these specifications was offered for the purpose only of showing that Stevens was a party to the combination and its admission worked no injury to this appellant's case. The specifications are overruled.

The questions raised by the specifications of error which refer to the so-called second and third counts of

the indictment have become immaterial. The appellant was convicted on all the counts of the indictment, the first count is undoubtedly good and conviction on that count is sufficient to sustain the sentence imposed by the court below, and the specifications of error must be dismissed.

The twentieth specification of error is based upon the refusal of the court to withdraw a juror and continue the case because of certain language used by the district attorney in his closing argument to the jury. In disposing of a motion of this character the court below exercises a discretion which is reviewable only for abuse. There may be instances where the refusal to withdraw a juror because of an objectionable remark of the district attorney would be, in all the circumstances, an abuse of discretion, but the remarks complained of in the present case are not of that nature and it may be fairly held that they were called out by the appellant's counsel, who it is admitted had said "The Commonwealth is bound to prove its case; we are not bound to prove our innocence; and the fact that they took five days and a half to present their case, and we took one hour, shows to you, gentlemen of the jury, that they must have considered that they had a very hard job on hand." This language upon the part of defendant's counsel invited a retort in kind and the language of the district attorney in that retort is the subject of the complaint under this specification of error. What was said by our Brother ORLADY in Commonwealth v. Sarves, 17 Pa. Superior Ct. 407, is applicable in this instance: "While the printed record indicates that in the contest before the jury excessive earnestness on the part of contending counsel was displayed, and expressions of doubtful professional propriety were used, yet it is not clear that the manner of trial injuriously affected the defendant. Such forensic displays rarely affect the deliberate judgment of a jury, and in this case they were conducted under the supervision of the trial judge, who fully guarded the

rights of the defendant in a temperate and impartial charge." The court below was in better position to know than we are whether the remarks were likely to have a prejudicial effect, an effect which could only be counteracted by allowing the motion. Upon a full view of the charge of the court, which followed these alleged objectionable remarks, and of the evidence in the case, we are unable to conclude that there was such abuse of discretion as requires a retrial of the case: Commonwealth v. Shields, 50 Pa. Superior Ct. 1.

The judgment is affirmed, and it is ordered that the defendant, the appellant, appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with the sentence, or any part of it, that had not been performed at the time this appeal was made a supersedeas.